*NOT FOR PUBLICATON*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel*. DAVID FREEDMAN,<br><br>Plaintiff,<br><br>v.<br><br>BAYADA HOME HEALTH CARE, INC., BAYADA, a tax-exempt organization, J. MARK BAIADA, and DAVID BAIADA,<br><br>Defendants. | Civil Action No. 3:19-cv-18753-FLW-ZNQ<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

Plaintiff David Freedman ("Relator") sues Bayada Home Health Care, Inc. ("Bayada"), a tax-exempt parent organization, J. Mark Baiada, and David Baiada (collectively, "Defendants") to recover damages under the False Claims Act ("FCA") and New Jersey False Claims Act ("NJFCA") for allegedly acquiring a home healthcare agency from the Ocean County Board of Health ("Ocean County") by fraud, then submitting $36 million in (seemingly legitimate) Medicare bills to the federal government. Freedman sues on behalf of the United States pursuant to a *qui tam* provision in the FCA, *see* 31 U.S.C. § 3729 *et seq*., and the State of New Jersey pursuant to an analogous state law. *See* N.J.S.A. § 2A:32C-1 *et seq*. Defendants now move to dismiss on the grounds that Freedman's "fraud-in-the-healthcare-transaction" theory of liability would "wildly expand the scope" of the FCA and "has no grounding in authority." Freedman opposes, arguing that the FCA is designed to reach all types of fraud that might result in a loss to the government, including fraudulently induced contracts resulting in subsequent government

payments, regardless of the validity of the payments themselves. For the following reasons, Bayada's Motion to Dismiss the FCA claims is **GRANTED**, and I **DECLINE** to exercise supplemental jurisdiction over the remaining NJFCA claims, for which the statute of limitations will be tolled for thirty (30) days from the date of this Opinion to permit time to refile in state court.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Bayada provides at-home clinical services to 28,000 patients across six countries. *See* Compl., ¶ 14. J. Mark Baiada founded the company in 1975 and served as CEO until January 2017, when his son, David Baiada, succeeded him. *Id.* ¶¶ 14-15. Freedman served as Bayada's Director of Strategic Growth from January 2009 until August 2016, working directly under David Baiada, then-COO. *Id.* ¶¶ 13, 16.

In 2011, Ocean County began considering whether to sell its home healthcare agency. *Id.* ¶ 25. Freedman contacted County Administrator Carl W. Block on October 7, 2011, suggesting Bayada as a buyer. *Id.* ¶ 26. Around that time, Bayada asked George Gilmore, an attorney and local Republican Party chair, to "lobby" on its behalf. *Id.* Gilmore engaged in various efforts to that end, both before and after signing a retention agreement for legal services in March 2012.[2] *Id.* ¶¶ 27-28, 38. For example, Gilmore allegedly spoke to Block about Bayada in November 2011, and learned that "[n]o one has any conflicts or anything negative to say." *Id.* ¶ 27. This led Freedman to believe that "retaining [ ] Gilmore could be determinative of whether Bayada or a competitor [wins] the right to purchase Ocean County's home health care agency." *Id.* ¶ 28. Troublingly, he told the Baiadas: "this is an insider's game, and [Gilmore] is the ultimate insider.

---

1       For the purposes of Bayada's motion, I accept the facts in the Complaint as true.

2       The terms of the retention agreement were: $400/hour for partners, $275/hour for associates, and a $20,000 retainer. *See* Compl., ¶ 39.

We are getting a lobbyist, not a lawyer . . . . It's a disguise and how these guys do business."[3] *Id.* ¶ 30. Then, in April 2012, Gilmore allegedly arranged a meeting between David Baiada and Robert Singer, a State Senator and Vice Chairman of the Ocean County Health Board, *id.* ¶ 40, after which David Baiada purportedly emailed Freedman stating that Singer was "very pleased" about the prospect of Bayada as a buyer and Gilmore would "make sure no 'interlopers' can bid to shut out competition." *Id.* ¶ 41. On May 7, 2012, according to the Complaint, Gilmore also provided Bayada with non-public information obtained from Victoria Miragliotta, the County Health Board's CFO. *Id.*

Ocean County did not formally seek bids until June 5, 2014, when it issued a "Request for Competitive Contracting Proposals for the Purchase and Transfer of the Operating Rights of the Home Health Care Agency" ("the RFP"). *Id.* ¶ 31. Bayada submitted its proposal on July 25, 2014, one of two bidders to do so. *Id.* ¶ 44. The RFP contains various provisions which Freedman asserts are relevant to this case. First, the "No Broker Fee" provision states that "no . . . commissions have been paid to third parties in connection with the transaction subject to this RFP." *Id.* ¶ 32. Second, the "Offer of Gratuities/Integrity" provision states that:

> The Proposer shall not, in connection with this or any other agreement with the Ocean County Board of Health, directly or indirectly, offer, confer or agree to confer any pecuniary benefit on anyone as consideration from the decision, opinion, recommendation, vote, other exercise of discretion, or violation of known legal duty by any governmental official or employee.

*Id.* That provision also states that:

> By submission of a response, the Proposer certifies that no gratuities of any type were either offered to or received by any elected or appointed official or employee of the Ocean County Board of Health or the State of New Jersey or its political subdivision in connection with this procurement from the Proposer . . . . If this

---

3       Based on Freedman's own allegations, it appears that he facilitated the alleged fraud of which he now complains. This calls into question his motives for bringing this suit.

prohibition is violated, any contract arising from these specifications may be terminated by the Board.

*Id.* ¶ 34. Finally, bidders must submit a "Non-Collusion Affidavit" with the following representation:

> Proposer has not, directly or indirectly entered into any agreement, participated in any collusion, or otherwise taken any action in restraint of free, competitive bidding in connection with the above named project; and that all statements contained in said proposal and in this affidavit are true and correct, and made with full knowledge that the Ocean County Health Department relies upon the trust of the statements contained in said Proposal and in the statements contained in this affidavit in awarding the contract for the said project.

> I further warrant that no person or selling agency has been employed or retained to solicit or secure such contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except bona fide employees or bona fide established commercial or selling agencies maintained by [Proposer].

*Id.* ¶ 35. The "Non-Collusion Affidavit" provides a warning: "FAILURE TO COMPLY WITH THE BIDDING PROCESS, COMPLETION AND SUBMITTAL OF ALL OF THE ABOVE DOCUMENTS ON THE FORMS PROVIDED HEREIN, WILL RESULT IN A REJECTION OF YOUR PROPOSAL." *Id.* ¶ 36. These provisions reflect N.J.S.A. § 52:13C-21.5, which bans contingent fee lobbying, and N.J.S.A. § 2C:21-34(b), which bans false representations in connection with a bid for a government contract.

Nevertheless, days before submitting its proposal to Ocean County, David Baiada apparently offered Gilmore a "success fee" on top of his retention agreement. *See* Compl., ¶ 43. According to the Complaint, Gilmore would receive $100,000 if Bayada could buy Ocean County's home healthcare agency for $4.1 to 5 million, or $200,000 if Bayada could buy it for $2.5 million plus five percent of gross revenue for 10 years. *Id.* Freedman claims that he and Baiada discussed "dig[ging] up quality data" on its bid competitor, Ocean Certified Homecare, LLC, "for [Gilmore] to use as ammo" in the selection process, *id.* ¶ 47, but decided not to because Bayada's

4

own quality scores were not "that great." *Id.* ¶ 49. Bayada did not disclose its arrangement with Gilmore to Ocean County at any time.

Ocean County Health Department completed its bid evaluation on August 8, 2014. *Id.* ¶ 51. Bayada scored 279/300, while Ocean Certified Homecare scored 206/300. *Id.* ¶ 52. The Health Department recommended awarding the contract to Bayada, *id.*, and the Board of Health passed a resolution to that effect on August 13, 2014, on a 5-1 vote, over the objections of Ocean Certified Homecare, which pointed out that it bid $500,000 more than Bayada, had not been informed of the applicable scoring sheet, and followed the rule disallowing alternative proposals, contrary to Bayada. *Id.* ¶ 50, 54. Ocean County sent Gilmore a contract, in his capacity as Bayada's representative, that day. *Id.* ¶ 55. Bayada obtained Ocean County's license on December 29, 2014, *id.* ¶ 57, enrolled as a Medicare provider in January 2015, *id.* ¶ 58, and billed approximately $36 million to the federal government through 2019. *Id.* ¶ 60.

On October 7, 2019, Freedman filed suit under seal in accordance with 31 U.S.C. § 3730(b)(2). The United States declined to intervene, *see* 31 U.S.C. § 3730(b)(4)(B), after which I unsealed the Complaint. Freedman now proceeds *qui tam* pursuant to 31 U.S.C. § 3730(c)(3). This Court has question jurisdiction over Freedman's FCA claims under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a). *See United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). Counts I-III assert violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G), while Counts IV-VI assert violations of N.J.S.A. §§ 2A:32C-3(a), (b), and (g).

Before the Court is Bayada's dismissal motion. Bayada argues that Freedman has not plead a cognizable theory of liability under the FCA because he merely alleges that Bayada fraudulently acquired Ocean County's home healthcare agency, not that Bayada made any false statements to the United States, much less false statements material to the government's payment decisions.

According to Bayada, "[a]n alleged misrepresentation that does not relate in any way to the health care services for which claims are submitted to federal health care programs simply cannot" form the basis of an FCA claim. *See* Def. Br., at 12. Freedman contends in response that, but-for Bayada's fraudulently obtained contract with Ocean County, it never would have received government payments in the first place, and FCA liability attaches to every claim submitted to the United States to that extent, regardless of whether Bayada made no literally false statements to the government.

## II.   LEGAL STANDARD

A court may dismiss an action under Fed. R. Civ. P. 12(b)(6) if a plaintiff fails to state a claim upon which relief can be granted. *Id.* When evaluating a Rule 12(b)(6) motion, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). A complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To determine whether a complaint is plausible, a court conducts a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court "takes note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Second, the court identifies allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal*, 556 U.S. at 679). For example, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not

do," *Iqbal*, 556 U.S. at 678, nor am I compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). Third, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago*, 629 F.3d at 131 (quoting *Iqbal*, 556 U.S. at 680). This is a "context-specific task that requires the [ ] court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

An FCA complaint must also meet Fed. R. Civ. P. 9(b)'s heightened pleading standard. *See U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017). In general, Rule 9(b) requires a plaintiff "to plead fraud with particularity, specifying the time, place and substance of the defendant's alleged conduct." *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (holding that a plaintiff must set forth the "who, what, when, where, and how" of the alleged fraud) (citation omitted). In the FCA context, however, a plaintiff must provide only "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal, Ventures Mgmt., LLC*, 754 F.3d 153, 157-58 (3d Cir. 2014). A plaintiff need not show "the exact content of the false claims in question," as "requiring this sort of detail at the pleading stage would be one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Foglia*, 754 F.3d at 156 (quotations and citation omitted).

## III.   DISCUSSION

### A.  *Qui Tam Suits*

"[T]he FCA makes it unlawful to knowingly submit a fraudulent claim to the government." *U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 840 (3d Cir. 2014). Specifically, it is unlawful for any person to "knowingly present[ ], or cause[ ] to be presented, . . . a false or fraudulent claim for payment or approval," or "knowingly make[ ], use [ ], or cause[ ] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the [g]overnment." 31 U.S.C. §§ 3729(a)(1)-(2). "The primary purpose of the FCA is to indemnify the government—through its restitutionary penalty provisions—against losses caused by a defendant's fraud." *Wilkins*, 659 F.3d at 304 (quotations omitted). The FCA contains a *qui tam* provision to this end, which permits private parties such as Freedman, called "relators," to bring suit on behalf of the United States. *See* 31 U.S.C. § 3730(c)(3). If successful, a relator gets a percentage of the recovery. *See* 31 U.S.C. § 3730(d)(2).

There are three categories of false claims under the FCA: factual falsity, legal falsity, and fraudulent inducement. *See Wilkins*, 659 F.3d at 305. "A claim is factually false when the claimant [knowingly] misrepresents what goods or services [ ] it provided to the Government." *United States v. Eastwick Coll.*, 657 Fed. App'x. 89, 93-94 (3d Cir. 2016) (quotations and citation omitted). "[A] claim is legally false when the claimant knowingly falsely certifies that it has complied with a material statute, regulation, or contractual provision." *Id.* A legally false certification claim may be express or implied. *See Wilkins*, 659 F.3d at 305; *United States ex rel. Jackson v. DePaul Health Sys.*, 454 F. Supp. 3d 481, 498 (E.D. Pa. 2020). Express false certification occurs where a claimant affirmatively misrepresents compliance with a particular statute, regulation, or contractual term. *See Eastwick Coll.*, 657 F.3d at 94. Implied false certification occurs where a claimant "makes specific representations about the goods or services provided," but fails to disclose that it violated "material statutes, regulations, or contractual

requirements," and its "failure to [do so] makes those representations misleading half-truths." *Universal Health Services, Inc. v. United States ex. rel. Escobar*, 136 S. Ct. 1989, 2001 (2016).

Finally, "a fraudulently induced contract may create liability under the [FCA] when that contract later results in payment thereunder by the government, whether to the wrongdoer or someone else." *United States v. Veneziale*, 268 F.2d 504, 505 (3d Cir. 1959) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) (superseded by statute)). A claimant is liable on this theory "even in the absence of evidence that the claims [are] fraudulent in themselves." *Siemens AG*, 593 Fed. App'x. at 143. While this language is seemingly broad, courts have cabined liability thereunder. To defeat dismissal, a relator must at least allege that the fraudulently induced contract touches or concerns the United States, or else one could advance an FCA claim merely by tracing back to any underlying transaction that caused a claim to reach the government, no matter how immaterial or inconsequential. This is the unstated premise in the case law, *see infra*, because the FCA "is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations," *Escobar*, 136 S. Ct. at 2003 (quotations and citation omitted), nor a "blunt instrument to enforce compliance with all . . . regulations," *Petratos*, 855 F.3d at 490, and "only 'actions which have the purpose and effect of causing the government to pay out money' where it is not due . . . are considered 'claims' within [its] meaning." *United States ex rel. Int'l Broth. of Elec. Workers, Local Union No. 89 v. Farfield Co.*, 2013 WL 3327505, at *3 (E.D. Pa. July 2, 2013) (quoting *United States v. Lawson*, 522 F. Supp. 746, 750 (D.N.J. 1981)).

B. *Fraudulent Inducement*

The crux of Freedman's Complaint is that Bayada did not inform Ocean County of its contingency fee arrangement with Gilmore, despite the fact that the RFP and state regulations prohibit paying lobbyists that way, and as a result, fraudulently acquired Ocean County's home

healthcare agency. *See* Compl., ¶ 7. Freedman argues that this fraud taints every subsequent claim Bayada submitted to Medicare. Bayada vehemently disagrees, contending that Freedman "asks this Court to effectively re-write the FCA . . . to include alleged misrepresentations or false statements made during commercial transactions – even when the misrepresentations have nothing to do with government health care programs and the services provided to its beneficiaries – merely because the transactions may subsequently lead to the submission of claims." *See* Def. Br., at 2.

"To prevail on a fraudulent inducement claim under the [FCA], a plaintiff must show that (1) there was a knowingly false or fraudulent statement; (2) that the statement was material; and (3) that it caused the government to pay out money or to forfeit moneys due (*i.e.*, a 'claim')." *Siemens AG*, 593 Fed. App'x at 143; *see also United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017) ("A False Claims Act violation includes four elements: falsity, causation, knowledge, and materiality."). Statements are made "knowingly" when made with "actual knowledge," "deliberate ignorance," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Statements are "false" when objectively untrue. *See Siemens AG*, 593 Fed. App'x. at 143. I discuss each element in turn.

i.     Falsity

Bayada begins by arguing that Freedman fails to plead falsity because "he offers no allegations explaining how any claims for home health services submitted *to government healthcare programs* were [even] misleading," instead pointing to representations "during the wholly unrelated bid process" with Ocean County. *See* Def. Br., at 7. The falsity element "asks whether [a] claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment set by the government." *United States ex rel. Druding v. Care Alts.*, 952 F.3d 89, 97 (3d Cir. 2020).

Bayada's position is not entirely correct. First, the Third Circuit "never ha[s] held that a plaintiff must identify a specific claim for payment at the *pleading stage* of the case to state a claim for relief," even under Rule 9(b)'s heightened pleading standard. *Wilkins*, 659 F.3d at 308 (emphasis in original); *United States v. Wavefront, LLC*, No. 20-5094, 2021 WL 37539, at *5 (D.N.J. Jan. 5, 2021). Second, because Freedman pleads fraudulent inducement, Bayada's reliance on *U.S. ex rel. Zwirn v. ADT Sec. Servs., Inc.*, for the proposition that the Complaint is too general is inappropriate. *See* No.10-2639, 2014 WL 2932846, at *8 (D.N.J. June 30, 2014) (granting motion to dismiss, *in implied false certification context*, when "broad and sweeping allegations" of relator's complaint "lack[ed] precision," and relator resorted to attacking "*all* invoices" and "*every* document" submitted to the government) (emphasis in original). Third, under fraudulent inducement case law, it is irrelevant whether Bayada's ultimate claims themselves are legitimate. *See Siemens AG*, 593 Fed. App'x. at 143; *Smith v. Carolina Med. Ctr.*, 274 F. Supp. 3d 300, 310 (E.D. Pa. 2017). The essence of his theory is that the government never owed Bayada in the first place because an improper contract induced the payments.

That said, and although the allegations in the Complaint are concerning, Bayada is correct that Freedman cannot plead falsity in the context of the FCA merely by pointing to the contract with Ocean County. Freedman offers no facts to support his theory that Bayada's misrepresentations during the course of its bid touched or concerned the federal government, or induced the government to enroll Bayada as a Medicare provider, except that a successful bid was one of many antecedent but-for causes of Bayada's application with the Center for Medicare & Medicaid Services ("CMS"). *See Eastwick Coll.*, 657 Fed. App'x. at 94. Freedman's reasoning—that sequence establishes consequence—is insufficient.

The case law Freedman relies on does not bring him any closer. Freedman first cites *Hess*, where electrical workers conspired to eliminate competition for local government contracts, which involved Public Works Administration ("PWA") projects. *See* 317 U.S. at 543. The Supreme Court permitted the FCA claim. *Id.* Yet, PWA imposed the bidding process in the first place, bidders knew from the start that they were bidding for PWA projects despite the fact that local governments administered the contracts, and winning contractors filed claims for payment with PWA directly on PWA forms. *Id.* To that extent, the initial bid-rigging affected "every swollen estimate which was the basic cause for payment of every dollar paid by the P.W.A.," and "every step thereafter taken, pressed ever to the ultimate goal – payment of government money to persons who had caused it to be defrauded." *Id.* Likewise, the government "would never have been placed in the joint fund for payment to [defendants] had its agents known the bids were collusive," and the scheme "could not have been any more of an effort to cheat the United States if there had been no state intermediary." *Id.* at 544. The same cannot be said in this case, *i.e.*, there are no allegations that the federal government played any role in the bid or contract process. Without such a connection, Bayada's alleged efforts to cheat the County cannot reasonably be construed as an attempt to also cheat the United States, and the fraud (to the extent it exists) "spen[t] itself with the execution of the contract." *Id.*

Freedman also cites *Veneziale*, where applicants misrepresented information on loan documents, which they submitted *directly* to the Federal Housing Administration ("FHA"). *See* 268 F.2d at 504. Their false assertion—that they needed the loan for home improvements rather than to buy new property—"was an essential inducement to the [FHA] guaranty," and on that basis, the Third Circuit permitted the FCA claim. *Id.* at 505-06. Here, on the other hand, Freedman alleges that Bayada lied to the United States only incidentally, through its lie to Ocean County

about how it paid Gilmore, which may be problematic for the purposes of state anti-fraud, pro-disclosure, or ethics statutes, but not necessarily under the FCA. Freedman's reliance on *Siemens AG* fails for the same reason: defendants fraudulently induced the government to pay for medical equipment by misrepresenting information *directly* to the Veterans Administration, which ran the bidding process. *See* 539 Fed. App'x. at 144.

Finally, Freedman cites *Plavix*, which I decided, for the proposition that "fraudulent inducement is an accepted theory of liability" in this circuit. *See* Pl. Br., at 23. True, but everything else about that case cuts the other way. In *Plavix*, a relator alleged that defendants misrepresented the efficacy of a blood thinner to physicians and state formulary committees, charging one hundred times more when in fact their drug was no better than aspirin, which triggered automatic government payments for prescriptions. *See* 332 F. Supp. 3d at 934, 945. According to the relator, this violated a Medicaid condition limiting coverage to cost-effective treatments. *Id.* at 933. Setting aside the fact that *Plavix* involved "non-contract interactions," and so does not fit these circumstances, I rejected the relator's "fraud-in-the-formulary-committee theory" as "a step toward bringing all misrepresentations . . . within the purview of the FCA." *Id.* at 952-53. Although this case does not involve non-contract interactions like *Plavix*, the same concern gives me great pause: as pled, Freedman seeks to bootstrap FCA liability to a contract negotiated, executed, and performed without any federal government participation, and related to the $36 million claims only insofar as the contract literally placed Bayada in a position to apply to Medicare. Short of explicit guidance from the Third Circuit that the FCA's falsity element is so expansive, and despite my reservations about the way in which Bayada became the successful bidder for Ocean County's healthcare agency, I decline to adopt Freedman's theory.

13

In sum, Freedman devotes his Complaint to attacking how Bayada acquired Ocean County's healthcare agency, without ever demonstrating how that acquisition touches or concerns the United States, or induced action on its part, other than by permitting Bayada to enroll as a service provider with CMS seven months later. The fact that the Complaint is replete with information about Bayada's less than transparent conduct during bidding, yet is devoid of anything linking that process or transaction to the federal government beyond merely the order of the events, undercuts Freedman's theory. Accordingly, Freedman has not pled falsity in the sense of the FCA.

        ii.   <u>Materiality</u>

Assuming Freedman "could somehow plausibly allege" falsity, Bayada argues, he still fails to plead materiality. *See* Def. Br., at 7, 9. Not all false or fraudulent statements are actionable under the FCA. *See United States v. Board of Educ. of City of Union City*, 697 F. Supp. 167, 174 (D.N.J. 1988); *United States v. Greenberg*, 237 F. Supp. 439, 442 (S.D.N.Y. 1965). False statements must also be material, meaning they must "hav[e] a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). "The materiality standard is demanding" and "rigorous," and a material misrepresentation "goes to the very essence of the bargain." *Escobar*, 136 S. Ct. at 2002-03 & n.5. By contrast, "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment," nor "where noncompliance is minor or insubstantial." *Id.* at 2003; *see also Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008). Although *Escobar* is an implied false certification theory case, its principles "seem to apply with equal force to the fraudulent inducement theory." *Wavefront*, 2021 WL 37539, at *7.

Freedman's core argument here is that Bayada's failure to disclose its contingency fee arrangement with Gilmore was material to *Ocean County's* decision to select Bayada's proposal, given the provisions in the RFP—particularly the "Non-Collusion Affidavit"—and state regulations barring such arrangements. *See, e.g.*, Compl., at ¶¶ 6-7 ("[U]nder the express terms of Ocean County's [RFP], if the defendants' use of a contingency fee arrangement in connection with Bayada's bid for the county's home health agency had been disclosed, then the bid would have been summarily rejected."); *id.* ¶¶ 32-37, 45-46, 53; Pl. Br., at 21 ("The Complaint contains numerous, specific, fact-based allegations that Bayada's false certifications to the County were not only material to the County's decision, but in fact if known would have resulted in the non-discretionary rejection by the County of Bayada's bid."); *id.* at 21 n.10 ("[T]he most plausible inference to be drawn from Defendants' false Non-Collusion Affidavit and intentional concealment of its fraud is that Defendants themselves recognized that disclosure of their arrangement with Gilmore would have disqualified them as a bidder.").

These allegations fail under the FCA. First, "materiality is judged exclusively in relation to the government's payment decision" on Bayada's claims, not Ocean County's determination to select Bayada's bid. *Plavix*, 332 F.3d at 948; *Petratos*, 855 F.3d at 492 ("Because the False Claims Act was passed to protect the federal treasury, and since the Government decides on payment, it is the Government's materiality decision that ultimately matters.") (internal citations omitted). In other words, "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," *Escobar*, 136 S. Ct. at 2002, which is "always" the government "in the False Claims context." *Petratos*, 855 F.3d at 491. By arguing that Bayada's alleged fraud would have changed Ocean County's bid selection, and maintaining that the fraud is material to the United States' payment decisions on that basis alone, Freedman misses the mark. *Accord*

*D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) ("[A]lleging that the fraudulent representations 'could have' influenced the [government] . . . falls short.").

Notwithstanding this problem, "there are no factual allegations showing that CMS would not have reimbursed [Bayada's] claims had [its] [alleged fraud] been [disclosed]," which "dooms" Freedman's claim. *Petratos*, 855 F.3d at 490; *cf. United States ex rel. Wood v. Allergan, Inc.*, No. 10-5645, 246 F. Supp. 3d 772, 818 n.29 (S.D.N.Y. 2017) (finding materiality where relator "provide[d] evidence of agreements expressly designating compliance with the [relevant statute] as a condition of payment; detail[ed] alerts and guidance documents issued by the Government during the relevant time period warning against [statutory] violations; note[d] the severity of civil and criminal punishment for such violations; describe[d] the legislative history [supporting the materiality of the statute]; and plead[ed] a kickback scheme that, taken as true, defrauded the government into paying hundreds of millions of dollars in prescription drug claims that were not eligible for reimbursement").

In other words, Freedman fails to adequately aver that the United States would place any—much less decisive—significance on how Bayada paid its lobbyist, if discovered, or on the fact that Bayada allegedly violated municipal contract provisions/state regulations regarding contingency fees in acquiring Ocean County's healthcare agency. For instance, the Complaint contains no facts suggesting that "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with" these rules, or has ever done so before. *Escobar*, 136 S. Ct. at 2003. The Complaint also does not contain facts suggesting that said compliance is "so central" to participating as a provider, rather than "minor and insubstantial." *Id.* at 2004; *see also Petratos*, 855 F.3d at 490 (rejecting materiality in part because relator "fail[ed] to plead that CMS

'consistently refuses to pay' claims like those alleged"). And neither the briefs nor the pleadings cite case law where a court has recognized a similar theory.

Freedman's argument to the contrary—he recasts causation as materiality—is unavailing.[4] Freedman attempts to center the Court's inquiry on Bayada's course of conduct with Ocean County to show that, but-for Bayada's alleged fraud, the United States would not have paid any claims, because Bayada could not have submitted them. Causation does not *ipso facto* make a fraud material to the United States' subsequent payment decisions, just like it does not *ipso facto* establish falsity. In any event, Freedman "conflates materiality with causation, a separate element of a False Claims cause of action." *Petratos*, 855 F.3d at 481; *Wilkins*, 659 F.3d at 304-05. Collapsing these elements renders the materiality element "surplusage," which the Third Circuit is "loath to do" in this context. *Tavarez v. Klingensmith*, 372 F.3d 188, 190 (3d Cir. 2004). The "alleged fraud's effect on [Ocean County] is relevant to the extent that it caused claims to eventually reach CMS," but "evidence of how [a] claim makes its way to the government should be considered under the causation analysis, while the materiality analysis begins after a claim has been submitted," at the point of payment. *Petratos*, 855 F.3d at 492. Because Freedman has not pled that compliance with the RFP or its sister state regulations regarding lobbying fees goes to the essence of his relationship with Medicare, he has not plausibly alleged materiality in the sense of the FCA.[5] In all, Freedman's fraudulent inducement claim hinges on but-for causation alone, and he fails to state a claim for relief under the FCA to that extent.

---

4       Freedman also argues that "materiality in FCA cases is generally a fact issue inappropriate for deciding a motion to dismiss." *See* Pl. Br., at 25, 27 n.12. The Supreme Court has expressly rejected that argument. *See Escobar*, 136 S. Ct. at 2004 n.6 ("We reject Universal Health's assertion that materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss or at summary judgment. The standard for materiality that we have outlined is a familiar . . . one. And False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality.").

### C.  *False Certification*

Freedman also argues that Bayada is liable on a false certification theory for omissions or misrepresentations it allegedly made on CMS-855A, a Medicare/Medicaid enrollment form, and UB-04, a claim form. *See* Pl. Br., at 25-29. Bayada contends that Freedman "improperly attempts to supplement the facts pled in his Complaint" to raise this theory, *see* Def. Rep. Br., at 9, and fails to support it in any event.

### i.     *Express False Certification*

Without much clarity, and for the first time in his opposition brief, Freedman asserts that forms CMS-855A and UB-04 "include[] an express certification," which Bayada violated by not disclosing its fraud on Ocean County. *See* Pl. Br., at 28; *id.* at 2 ("Relator's complaint . . . pleads detailed facts supporting multiple theories of liability . . . including . . . express false certification."); *id.* at 8 (same). First, Freedman cannot bring this claim without pleading it in his Complaint. *See Comm. of Pa. ex. rel Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). Even if properly alleged, Freedman does not point to any provision in either form where Bayada explicitly represented compliance with the RFP's anti-contingency fee provisions or New Jersey's analogous regulations, or a more general provision requiring Bayada to affirm that it complied with state-law and contract rules governing the acquisition of its underlying healthcare service. *Cf. United States ex rel. Greenfield v. Medco Health Solutions, Inc.*,

---

5       Bayada does not specifically challenge causation, but because Freedman fails to allege falsity and materiality, I need not address this element. I note, however, that but-for causation is generally insufficient for the purposes of the FCA. *See, e.g.*, *Petratos*, 855 F.3d at 491 ("[T]he causation element cannot be met merely by showing 'but for' causation."); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006) (explaining that a false claim must be "integral to a causal chain leading to payment") (citations omitted); *cf. Paroline v. United States*, 134 S. Ct. 1710, 1720 (2014) ("Proximate cause is a standard aspect of causation in . . . the law of torts.").

880 F.3d 89, 98 (3d Cir. 2018) (explaining express certification requirement for the Anti-Kickback Statute in CMS-855A). Freedman's Complaint in this regard fails to state an express false certification claim.

### ii.     *Implied False Certification*

Freedman also asserts that Bayada implicitly misrepresented its compliance with the RFP and New Jersey's analogous regulations on forms UB-04 and CMS-855A. Again, Freedman improperly supports this theory by invoking UB-04 for the first time in his brief. *See supra*. Regardless, when filling out that form, Bayada certified the accuracy of its "billing information as shown on the face hereof," such as the bundle of services it delivered to Medicare beneficiaries, not the propriety of the conduct through which it became a CMS provider. *See* UB-04, *available at* CMS.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing-Items/CMS-1450 (last visited May 5, 2021). The certification language in UB-04 does not bear out the scope that Freedman seeks to give it.

While Freedman mentions form CMS-855A in the Complaint, he does so in conclusory fashion and without alleging the pertinent provisions. *See* Compl., ¶¶ 57-58 (quoting only 18 U.S.C. § 1001, the government's general criminal statute prohibiting false statements to officials). "[A] statement in a brief will not amend a deficient complaint," *Thomas v. John A. Youderian Jr., LLC*, 232 F. Supp. 3d 656, 670 (D.N.J. 2017), and Freedman fails to plead any facts relating to this form outside of his brief, much less facts showing that Bayada's representations were misleading half-truths about "core" program requirements. *See Escobar*, 136 S. Ct. at 2000.

Even if I were to consider the facts Freedman adds in his brief, he does not fare any better. In relevant part, when filling out CMS-855A, Bayada had to "certify that the information contained herein is true, correct, and complete" and acknowledge penalties for "any deliberate omission,

misrepresentation, or falsification of any information contained in this application." *See* CMS-855A, at 45, 48-49, *available at* CMS.gov/medicare/cms-forms/cms-forms/downloads/cms855a.pdf (last visited May 5, 2021). Bayada also had to attach "[l]icenses, certifications and registrations required by Medicare or State law" and a "[c]opy of all bills of sale." *Id* at 52. This certification language does not appear to encompass the entire sequence of events leading up to Bayada's enrollment in Medicare. *Accord U.S. ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674, 691 (E.D. Pa. 2009) (reading similar certification language in a National Institute of Health progress report not to cover false statements made in the original grant application); *United States ex rel. Simpson v. Bayer Corp.*, 476 F. Supp. 3d 392, 405-06 (D.N.J. 2019). CMS-855A more likely asks applicants to attest to the veracity of the statements and documents actually included in the application, not facts or events well beyond it.[6] Bayada's implied false certification theory fails for this reason as well.

### D.  State Law Claims

Finally, Freedman brings suit under the NJFCA for the same course of conduct discussed *supra*. *See* Compl., ¶¶ 72-73 (Count IV), 75-76 (Count V), 78-79 (Count VI). Because I dismiss all FCA claims, and there is no diversity, I decline to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court has discretion not to exercise supplemental

---

[6]     I must also reject Freedman's "reverse FCA claim," which alleges that Bayada "did not pay back the government money or property that it was obligated to return," or concealed/avoided such an obligation. *United States ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432, 444 (3d Cir. 2004). Here, although Freedman names this theory in his Complaint, *see* Compl., ¶¶ 69-70; Pl. Br., at 30 n.15 ("Counts III and VI . . . 'allege reverse false claims' violations."), he parrots the applicable statutory language without adding any supporting facts. This is precisely the manner of pleading I must reject under Rule 12(b)(6) and Rule 9(b). *See, e.g.*, *James*, 700 F.3d at 679 ("[W]e disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements."). Regardless, "the reverse false claims provision is not a vehicle to simply recast an identical claim under . . . traditional false claim provisions," as Freedman attempts to do. *United States ex rel. Laporte v. Premier Ed. Grp., L.P.*, No. 11-3523, 2016 WL 2747195, at *18 (D.N.J. May 11, 2016).

jurisdiction when it "has dismissed all claims over which it has original jurisdiction," as here); *United States ex rel. NHCA-TEV, LLC v. Teva Pharm. Prod. Ltd.*, No. 17-2040, 2019 WL 6327207, at *5 (E.D. Pa. Nov. 26, 2019) ("Because the FCA claims . . . have been dismissed, [31 U.S.C.] § 3732(b) [which provides that 'district courts shall have jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under [the FCA]'] is no longer applicable. That leaves supplemental jurisdiction under 28 U.S.C. § 1367 as the only potential basis of federal jurisdiction in this case."); *Foglia*, 754 F.3d at 155 n.2 (affirming, in an FCA case, the district court's decision not to exercise supplemental jurisdiction because "relator's federal claims are dismissed, and because this case is still at the pleadings stage," as here); *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) ("[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state law claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.") (emphasis in original). However, I will toll the NJFCA's statute of limitations for thirty (30) days so that Freedman may refile in the appropriate forum. *See* 28 U.S.C. § 1367(d); N.J.S.A. § 2A:32C-11 (providing a six-year period for NJFCA claims); *Freeman v. State*, 347 N.J. Super. 11, 31 (App. Div. 2002) (permitting equitable tolling "where plaintiff has timely asserted his rights mistakenly by either defective pleading or in the wrong forum").

## IV.  CONCLUSION

Freedman has not adequately pled fraudulent inducement or express/implied false certification in the sense of the FCA.[7] Accordingly, I **GRANT** Bayada's Motion to Dismiss the

FCA claims, and **DECLINE** to exercise supplemental jurisdiction over the NJFCA claims. The NJFCA's statute of limitations is tolled for thirty (30) days from the date of this Opinion, pursuant to 28 U.S.C. § 1367(d), to give Freedman time to refile in state court should he wish to do so. The Clerk is directed to **TERMINATE** this matter on the docket.

**DATED**: May 12, 2021                                   /s/ Freda L. Wolfson
                                                          Hon. Freda L. Wolfson
                                                          U.S. Chief District Judge

---

7       This is not to suggest that Bayada has no liability for the course of conduct described in the Complaint. Although Freedman's claims do not square with the FCA, accepting the facts he has pled as true, Bayada seemingly violated both the RFP and state law by failing to disclose its contingency fee arrangement with Gilmore, which presumably would have terminated its bid. Other parties, such as Ocean County or Ocean Home Certified, who were potentially harmed by these undisclosed actions, may have viable causes of action in state court.